Exhibit B

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
MADISON DIVISION**

| | |
|---|---|
| Richard Masephol,<br><br>         Plaintiff,<br><br>   v.<br><br>Weyerhaeuser Company, *a corporation;*<br>3M Company, *a corporation*;<br>Metropolitan Life Insurance Company*, a corporation*;<br>Owens-Illinois, Inc., *a corporation*;<br>Unknown Insurers of Owens-Illinois, Inc., *a corporation;*<br>Unknown Insurers of Roddis Plywood Corporation, *a corporation;*<br>Unknown Insurers of Weyerhaeuser Company, *a corporation;*<br><br>        Defendants. | Case No. 14-cv-186 |

## SECOND AMENDED COMPLAINT

Plaintiff Richard Masephol, by his attorneys, Cascino Vaughan Law Offices, Ltd., complain against the above defendants as follows:

## JURISDICTION AND PARTIES

1. Plaintiff Richard Masephol is an adult citizen and resident of Chili, Wisconsin. He is not married.

2. Defendant Weyerhaeuser Company ("Weyerhaeuser") is the former owner of a plant in Marshfield, Wisconsin ("Marshfield plant") where asbestos fireproofing products were manufactured and asbestos containing products were used in manufacturing production of fire doors. Weyerhaeuser is legally responsible for the conduct of Roddis Plywood

1

Corporation, the prior owner and operator of the Marshfield plant.

3.     Defendant 3M Company ("3M") designed, manufactured, and sold masks for personal breathing protection in occupational settings, including without limitation the 3M 8710.

4.     Defendant Metropolitan Life Insurance Company ("MetLife") conspired and acted to conceal information about the health hazards of asbestos from both individual end-users and industry.

5.     Defendant Owens-Illinois, Inc. ("O-I") designed and manufactured a product called Kaylo which contained amosite and chrysotile asbestos. O-I also sold licenses for a process patent to manufacture fire doors incorporating asbestos-containing cores.   O-I also manufactured, sold, and designed asbestos products, including without limitation fire door cores.   The brand name "Kaylo" was associated with both the patented doors and the cores.

6.     Unknown Insurers of Owens-Illinois, Inc. are named pursuant to Wis. Stats. §803.04(2)(a) as they have an interest in the outcome adverse to the plaintiffs.

7.     Unknown Insurers of Roddis Plywood Corporation are named pursuant to Wis. Stats. §803.04(2)(a) as they have an interest in the outcome adverse to the plaintiffs.

8.     Unknown Insurers of Weyerhaeuser Company are named pursuant to Wis. Stats. §803.04(2)(a) as they have an interest in the outcome adverse to the plaintiffs.

9.     Jurisdiction is based on diversity of citizenship of the parties hereto under Title 28, United States Code, §1332.

10.    The amount in controversy exceeds the sum of Seventy-Five Thousand Dollars ($75,000), exclusive of interest and costs.

2

11.     Venue is proper pursuant to Title 28, United States Code, §1391.

## GENERAL ALLEGATIONS

12.     During the period of all his exposures, plaintiff did not understand or appreciate the dangerous nature of asbestos and of the nature of the risks of asbestos.

13.     As a direct and proximate result of the conduct of all defendants, plaintiff suffered from the asbestos related disease malignant mesothelioma.

14.     The asbestos disease process and injury began before April, 1994.

15.     All exposures to asbestos that plaintiff received contributed to and caused the plaintiff's asbestos related conditions.

16.     Plaintiff suffers great pain, physical impairment, and great mental pain and anguish. He is liable for large sums of money for medical and hospital care, and suffered losses to his personal property and possessions.

17.     The operations at the Marshfield plant involve the manufacture of asbestos containing fire doors, including the disposal of the waste and scrap from such doors.   At certain times the mixing of asbestos fibers to make the cores for the fire doors was a part of the manufacturing process.

18.     Plaintiff inhaled airborne asbestos fibers released as a result of operations at the Marshfield plant as an employee of Weyerhaeuser, household exposures including from the first years of his life into his teenage years via his parents bringing asbestos home from the Marshfield plant, and community exposures via ambient air outside the plant.

19.     Asbestos was inhaled by plaintiff:

        a.      during periods of his actual employment at the Marshfield plant, from 1973 to 1979;

3

b. household and family asbestos exposures beginning as a young child including hugging his parents, the family car, and parents' work clothes and washing his parents clothes;

c. community exposures beginning as a child through adulthood, from asbestos fibers from the Marshfield plant contaminating the air, home, schoolyard, auto, restaurants, bars and other locations outside the plant when the plaintiff was not employed by Roddis or Weyerhaeuser;

d. community exposures during his whole life, including when he was not employed at the Marshfield plant, from visible emissions of asbestos dust in the community of Marshfield;

e. community exposures during plaintiff's life, including when he was not employed at the Marshfield plant from the transport of asbestos fibers to and from the Marshfield plant to other locations in the Marshfield community including the creation of visible emissions throughout the community of Marshfield;

f. community exposures during plaintiff's life, from the release of visible emissions by activities outside the plant, including by trucks driving down the road, not while plaintiff was employed;

g. community exposures during plaintiff's life, from the dumping of asbestos waste in landfills and former soaking ponds throughout the Marshfield community, not while employed;

h. during plaintiffs life, from visible emissions when the baghouse malfunctioned and released asbestos into the community, not while employed;

i. during plaintiffs life, from the open doors of buildings, wherein asbestos was part of any industrial process and through which wind would blow asbestos out of the plant, not while employed;

## COMMUNITY EXPOSURES CAUSE MESOTHELIOMA

20. The Environmental Protection Agency (EPA) via its National Emission Standards for Hazardous Air Pollutants (NESHAPs) bars visible emissions of asbestos materials outside the plants involved in the manufacture of fireproofing and insulating materials. NESHAPs recognized that persons in the neighborhood of asbestos sources develop mesothelioma.

21.   Roddis/Weyerhaeuser caused visible emissions of asbestos dust into the air outside the
Weyerhaeuser plant in Marshfield, Wisconsin.

22.   Community exposures are well-recognized as sources of asbestos exposure.

23.   The Environmental Protection Agency, subchapter C – Air Program, Part 61, National
Emission Standards Hazardous Air Pollutants (hereafter NESHAP), adopted a no visual
asbestos emissions standard for plants manufacturing fireproofing materials based upon
recognized reports of mesothelioma associated with non-occupational asbestos dust
emissions in the neighborhood. It also recognized that mesothelioma cases can occur after
much less exposure to asbestos dust.

24.   On March 30, 1973, NESHAP was enacted. Section 61.22, "Emission standard," provided
that

> "There shall be no visible emissions to the outside air, except as provided in
> paragraph (f) of this section, from any building or structure in which the
> following operations are conducted or directly from any of the following
> operations if they are conducted outside of buildings or structures...[which
> applies to the] manufacture of fireproofing and insulating materials."

25.   NSESHAPs cited literature that there are mesothelioma cases of non-workers who lived
near an asbestos plant. Some of this literature is part of the body of references that the EPA
relied upon in the formulation of its "no visible emissions" standard.   This literature
includes Dr. Wagner, who in the British Journal of Industrial Medicine in 1960 found that
most cases of mesothelioma were not workers in asbestos-related fields, but people who
lived in the surrounding communities. Wagner, in his study of mesothelioma in asbestos
mine workers, identified housewives, domestic servants, cattle herders, farmers, an
insurance agent and an accountant in the neighborhood who also developed mesothelioma

but never worked in the mines. This literature cited in NESHAPs also includes Newhouse and Thompson who in 1965 reported community exposures caused mesothelioma cases in London. Similarly, in 1967, the Archives of Environmental Health reported mesothelioma cases from neighborhood exposures.

26.    In addition, Inase identified a woman with mesothelioma in Japan whose only exposure to asbestos occurred during her childhood as a result of asbestos exposure from the emissions from the town's factories. Inase also summarized the literature on this issue including articles published from studies in the United States, Italy, the United Kingdom and South Africa.

27.    Community exposures from asbestos plants occur miles from the plant site.   When plaintiff was within several miles of the plant he would be exposed to asbestos.   A study published in the American Journal of Industrial Medicine by Kumagai and Kurumatani used a mesothelioma outbreak in Amagasaki city, in southwestern Japan, found a linear relation between asbestos concentration and the reported cases of mesothelioma. The outbreak was tied to an asbestos cement factory that produced asbestos pipe with crocidolite and chrysotile, which operated from 1957 to 1975.   Concentrations of asbestos measured in excess of background levels. Of particular interest is the higher mortality rate in women due to mesothelioma. During the years the asbestos cement plant was operational, women did not work and stayed either at home or out in the community. Kumagai and Kurumatani therefore used women as a benchmark for overall community exposure. They found that mortality decreased with distance from the plant, up to a range of approximately 4 kilometers (approximately 2.48 miles). Of 39 mesothelioma deaths in

women, all lived within 4 kilometers of the asbestos cement plant for at least 1 year, died

from mesothelioma between 1995 and 2006, and lacked occupational exposure to asbestos.

28.     There is also increased risk for developing mesothelioma from community exposures.   A

study published in the British Journal of Cancer by Magnani, et al., reached a similar

conclusion through different methods. Their study also found a higher rate of

mesothelioma in females, for whom no evidence of occupational exposure to asbestos was

found. Magnani and the other scientists concluded that the risk of developing

mesothelioma was statistically and significantly higher for environmental exposure, when

compared to domestic or household exposure, in mesothelioma patients who had lived at

some time within 2000 meters (approximately 1.25 miles) of a mine or asbestos works. The

study also observed that "environmental exposure to asbestos started at younger ages and

lasted longer" than domestic exposure. Overall, Magnani's study concluded that while

"[environmental and domestic exposures], either alone or combined with the other, showed

an increased, significant risk...[but that risk] seems to be higher for subjects with

environmental exposure only."

29.     The sources of the visual emissions outside the Marshfield plant included:

a.      The emissions' sources included the wind that blew visible asbestos dust from open

doors of buildings in which asbestos was used into the air outside the plant;

b.      emissions into the community's ambient air from Weyerhaeuser's trucks

containing asbestos waste materials along the trucks' routes throughout the town of

Marshfield;

c.      The emissions' sources included asbestos dust that fell from the air pollution

7

control equipment, including the baghouse, when these devices failed. This asbestos dust would collect in piles and then be dispersed by the wind into the ambient air outside the plant.

d.     The emissions' sources included trucks loaded with asbestos waste materials. These trucks were not properly covered. At any given time, there were two truck drivers working 12-hour shifts disposing of asbestos waste materials at former soaking pits, at least 4 landfills and farmers' fields across Marshfield, Wisconsin.

e.     The emissions' sources included the former soaking pits, at least 4 landfills and farmers' fields where asbestos waste materials were dumped. After the waste materials were dumped, they were not properly covered, and wind dispersed visible emissions of asbestos into the ambient air and community of Marshfield, Wisconsin.

f.     The Weyerhaeuser trucks drove down the main streets of Marshfield, Wisconsin and gave off visible asbestos emissions.

## MASEPHOL COMMUNITY EXPOSURES

30.   The community of Marshfield, Wisconsin was exposed to asbestos from the Marshfield Plant. People in the neighborhood complained about visible dust. Neighbors around the premises complained to Weyerhaeuser and wrote letters to the local newspaper about the dust, especially since it ruined the laundry they had hung out to dry. Because of this, people could not hang their laundry out to dry.

31.   The air pollution control equipment known as the baghouse continuously became congested and broke down, spewing dust out of the sides and top and dispersing it into the ambient air.

32.     The dust collected in the baghouse was hauled to various landfills in and around Marshfield, as well as three old log ponds between the plant and Fourth Street. These log ponds were partially filled with waste from the baghouse. The waste was hauled in large uncovered boxes on the front end of a loader and driven outside the plant's fence and along a driveway around the plant's western side. There was visible dust in the log ponds because Weyerhaeuser chose to never cover them. Weyerhaeuser simply dumped asbestos waste into them. Dumping asbestos waste into these log ponds put even more asbestos dust into the ambient air. Windows in the core mill were left open during the summer, allowing asbestos dust to get into the plant's ambient air.

33.     In order to get to work, plaintiff Masephol's parents would take highway 10. Highway 10 is a route the Weyerhaeuser trucks would use. There was also a dump close to Highway 10. This route also passed the Weber farm, where asbestos and lime was used in the soil. Plaintiff Masephol would go to town between 1 and 3 times a week after growing up. When he started working at Weyerhaeuser in the early 1970s, plaintiff drove to and from the Roddis/Weyerhaeuser plant on every workday.

34.     Windows in the core mill were left open during the summer, allowing asbestos dust to get into the plant's ambient air.

35.     The trucks dispersed visible asbestos dust while driving down the roads. At least one of these trucks was not covered. The Weyerhaeuser trucks that were loaded with asbestos waste were driven down highways 97, 13 and 10. These are the main streets both into and out of Marshfield. There were visible emissions from these trucks as they transported asbestos waste down public highways.

36.    Places in town, such as the cheese factory, bars and hamburger restaurants, close to the Weyerhaeuser plant would have their ambient air contaminated by visible asbestos dust.

37.    The baghouse that was intended to collect asbestos waste products continually and regularly broke down, dispersing asbestos into the ambient air.

38.    Community exposures also occurred when asbestos waste was put into trucks and driven to landfills. The dumps were never covered over with dirt after loads were dumped, which allowed more asbestos dust to disperse. The location of one of these dumps was close to Highway H and Highway 10, northwest of Marshfield, Wisconsin including by the airport. Plaintiff Masephol would drive down Highway H and Highway 10 with his father in order to get to and from Marshfield.

## HOUSEHOLD/FAMILY EXPOSURES CAUSE MESOTHELIOMA

39.    The U.S. Department of Health and Human Services's "Report to Congress on Home Contamination Study Conducted Under the Workers' Family Protection Act (29 U.S.C. 671a)" recognized that "[m]esothelioma has occurred following short term asbestos exposures of only a few weeks, and can result from very low levels of exposure. There may be a latency period of 40 years or longer between exposure and clinical disease."

40.    The US Department of Labor issued safety and health standards in 1951 that included the requirement that, "Workers who handle or are exposed to harmful materials in such a manner that contact of work clothes with street clothes will communicate to the latter the harmful substances accumulated during working hours should be provided with facilities which will prevent this contact and also permit the free ventilation or drying of the work clothes while they are not in use."

41.   In 1960, Wagner et al., published their landmark study showing the prevalence of mesothelioma in household contacts and residents near asbestos mines.

42.   The National Safety Council published a Data Sheet on safety procedures for handling hazardous materials in industry. This 1963 document recommended "[g]ood washing facilities, clean lunchrooms, and clean clothes can help prevent additional, even though minor, exposure to toxic materials. Also, contaminated work clothes should not be taken home where a toxic dust could contaminate the home or expose other members of the family."

43.   In 1965, Newhouse et al., published their study showing a clear association of mesothelioma among household members (children and housewives) whose only known exposure to asbestos was contamination brought home by another household member with occupational exposure to asbestos.

44.   P.G. Harries, in 1968, published an article concerning the necessity of providing workers exposed to asbestos with protective clothing and respiratory protection as well as using typical engineering controls such as isolation and ventilation. He also reported mesothelioma in Boilmakers, Fitters, Laborers, Shipwrights, and Welders at the shipyard he studied.

45.   Anderson, et al., in 1976, reported on their study of the disease status of household contacts of asbestos factory workers. They reported some 35% of all household contacts, whose only known exposure to asbestos were from contamination brought home by a household member who was exposed to asbestos in their work place, had asbestos-associated radiographic abnormalities. In their 1979 follow-up study, they had identified five

household contacts with mesothelioma.

46.     Sawyer in 1977 reports on an investigation of asbestos exposure concentrations in a college building. As part of their studies they collected the work clothes of abatement workers and laundered them. They collected 12 personal air samples while washing some 40 sets of work clothes. Results averaged 0.4f/cc [SD 0.2f/cc] with the highest concentration of 1.2 f/cc. They also took area samples:

     a.      Picking up clothes – 4 samples, Ave = 0.4 f/cc, SD 0.1 f/cc;

     b.      Loading washing – 5 samples, Ave = 0.4 f/cc, SD 0.1 f/cc; and

     c.      Loading dryer – Ave = 0.0 f/cc [Sic].

These examples demonstrate household exposures are significant.

47.     Bellin summarized the more current literature on this subject in 1981. She reviews cases of mesothelioma among wives and children of asbestos workers whose asbestos exposure was from washing the workers' clothing. This review established household exposures can cause mesothelioma.

48.     Grandjean, et al., summarized the literature concerning indirect exposure to hazardous materials, including asbestos. The literature establishes asbestos-related diseases among household members whose only known exposure arose from living in the same house or handling contaminated clothing of other members who were occupationally exposed to asbestos.

49.     In 1992, the US Congress requested NIOSH to conduct a study to "evaluate the potential for, the prevalence of, and the issues related to the contamination of workers' homes with hazardous chemicals and substances...transported from the workplaces of such workers."

NIOSH issued their report in 1995 with an entire section devoted to asbestos. NIOSH concluded:

    a.    "Families of asbestos-exposed workers have been at increased risk of pleural, pericardial, or peritoneal mesothelioma, lung cancer, cancer of the gastrointestinal tract, and non-malignant pleural and parenchymal abnormalities as well as asbestosis"; and

    b.    "The occupations associated with asbestos-related disease in family members are those where workers were exposed to asbestos dust during: construction and renovation; prospecting and mining; manufacturing textiles, tiles, boilers, and ovens; shipbuilding and associated trades; certain railroad shop trades; welding; insulation; use and manufacture of asbestos products such as cords, seals, and plates; and renovation and demolition projects within the construction industry."

50.    Roggli, et al., reviewed 1445 cases of mesothelioma and classified them by occupational exposure to asbestos. He identified 86 cases he classifies as household contacts where the only known exposure was from another household member who was an asbestos worker.

51.    Carter measured the airborne concentrations of asbestos created from asbestos-contaminated laboratory coats worn by workers who were simulating operating samll machines in an unventialated room and handling, carrying and stacking asbestos-containing cement board. He measured airborne concentrations between 3.3x106 fibers per cubic meter (0.3 f/cc to 2.4 f/cc).

52.    NIOSH conducted an experiment where they measured the airborne concentrations of

asbestos generated from shaking an empty burlap bag that had contained pure asbestos. The only source of asbestos was that remaining as contamination of the bag. The people conducting the experiment were exposed to airborne concentrations as high as 570 f/cc (>5 micron), extremely high levels of asbestos.

53.   Schneider, et al., reported on five cases of mesothelioma seen in their clinic. The patients had no history of occupational exposure to asbestos but resided in the household of workers who had been occupationally exposed to asbestos. They concluded that their only exposure to asbestos was from the clothing and shoes of the exposed workers. Patient exposures began in the 1950s or 1960s and the latency period ranged from 17 to 42 years. The patients' fathers' work activities included manufacturing asbestos-containing products, turbine repair, and insulation.

54.   Longo conducted a series of experiments to estimate asbestos fiber release from contaminated clothing. Under controlled conditions, they contaminated typical work clothing by handling asbestos-containing insulation. They then shook and brushed the clothes to represent someone, like a housewife, cleaning the dust off prior to placing into the washing machine. The clothes were shaken for approximately 1 minute. The operation took 7-8 minutes, including shaking, brushing and placing the clothes into the washing machine. Exposure concentrations experienced by the person handling the contaminated clothing ranged from 5.74 f/cc to 26.5 f/cc.

55.   Mangold conducted a series of experiemtns to determine the exposure concentrations generated solely by contaminated clothing. Results were as follows:

        a.       Heavily contaminated coveralls used during rip out of pipe insulation (3

samples). Results = 1, 1.8, and 1.5 f/cc (Average = 1.4 f/cc);

b.     Medium contaminated coveralls worn three days before change (3 samples). Results = 0.2, 0.5, and 0.8 f/cc (Average = 0.5 f/cc);

c.     Lightly contaminated coveralls worn three days before change (3 samples). Results = 0.1, 0.2, and 0.05 f/cc (Average = 0.1 f/cc).

## MASEPHOL HOUSEHOLD AND CHILDHOOD EXPOSURES

56.   Plaintiff Masephol's father was Emil Masephol. Plaintiff Masephol's father worked at both Roddis and Weyerhaeuser. His father drove a jimmie (an industrial vehicle similar to a forklift), worked in veneer, door inspection, patching, and in building and grounds maintenance.

57.   Plaintiff Masephol's father wore his work clothes home. He drove to and from work. Plaintiff Masephol would ride in the family care. Plaintiff Masephol's father would create dust both within and outside the car.

58.   As a child, Plaintiff Masephol would be next to his mother when she did the laundry, including his father's work clothes. His mother would shake out the clothes. His mother did the laundry in the dining room in the family home or at a laundromat on Division Avenue in Chili, Wisconsin. In either case, his mom shook out the clothes next to the Plaintiff.

## RICHARD MASEPHOL EMPLOYMENT HISTORY

59.   Beginning around 1973, Plaintiff Masephol worked at the Marshfield door plant as a member of Carpenters Union Local 1733. At that time, the plant was owned by Weyerhaeuser Company.

60.   When Plaintiff Masephol started at Weyerhaeuser, he worked in saw and sand on veneer-faced doors on the second shift for a few months. Then he bid for working in the core mill where he was initially doing jimmie-driving throughout the core mill. Thereafter, Plaintiff Masephol normally worked in the "Kaylo" portion of the core mill, where he cut and sawed the asbestos-containing fire door cores. Plaintiff Masephol did this work until February of 1979.

61.   Plaintiff Masephol always wore a 3M mask when he worked in the "Kaylo" portion of the core mill. He and his fellow coworkers were required to wear a mask in the "Kaylo" portion of the core mill. In the "Kaylo" portion of the core mill, the pieces of core were fabricated. Plaintiff Masephol and his fellow coworkers also would change out of their work clothes when they returned home after work.

## COUNT I - PRODUCT LIABILITY - NEGLIGENCE

62.   Plaintiffs bring this claim for negligence and restate and re-allege the allegations in paragraphs 1 – 61 above.

63.   Plaintiffs bring this claim against O-I and unknown insurers of O-I for selling, purchasing, manufacturing, designing, licensing and/or patenting of a process that used asbestos-containing materials and/or products.

64.   O-I designed, manufactured, and sold Kaylo core to Roddis during the late 1940s into the late 1950s.

65.   The Kaylo core was used to make fire doors. It would be cut, sawed, and sanded.

66.   Plaintiff was exposed to Kaylo dust in the 1950s when his parents brought it home on their

clothes and in their family car.

67.    The term "Kaylo fire doors" is used to refer to both O-I patented doors and cores sold by O-I. "Kaylow" was a registered trademark of O-I.

68.    O-I manufactured Kaylo block insulation that was used by Roddis/Weyerhaeuser as the fire door core material inside the fireproof doors.

69.    O-I sold Kaylo block insulation that was used as the fire door core material inside the fireproof doors.

70.    Owens Corning Fiberglass, through an agreement with Owens-Illinois, was the distributor of Kaylo block insulation for Owens-Illinois. Owens-Illinois was paid compensation by Owens Corning Fiberglass under the distribution agreement.

71.    Pursuant to a written agreement, defendant O-I allowed Roddis/Weyerhaeuser to manufacture the Kaylo asbestos-containing fire doors at least through September of 1959.

72.    Roddis/Weyerhaeuser licensed the process to make asbestos-containing fire doors from 1956 to 1960. The fire door cores contained asbestos because O-I reported asbestos as an ingredient in order to obtain a patent for the process.

73.    After O-I ceased the sale of asbestos-containing fire doors, Roddis/Weyerhaeuser were given permission by O-I to use O-I's name in the advertisements for Kaylo block insulation fore doors. These advertisements also listed Roddis Plywood Corporation as the successor to Owens-Illinois Plywood Company.

74.    Pursuant to a written license agreement, O-I was paid a royalty for each Kaylo fire door produced pursuant to the patented process. The patent called for the use of asbestos. The Underwriters Laboratories approval was based on the use of asbestos in the fire doors.

75. It was reasonably foreseeable to O-I that plaintiff and other workers working in or in proximity to Kaylo fire door production operations at Weyerhaeuser would inhale asbestos fibers released from the Kaylo fire doors during the production operations.

76. Defendant O-I knew or in the exercise of ordinary or reasonable care ought to have known asbestos causes serious and fatal disease. O-I had knowledge in the 1940s and 1950s that asbestos was harmful and caused disease. O-I was a manufacturer and vender of asbestos products, beginning in the 1940s and continuing through the 1950s. O-I had participated in scientific experiments that resulted in literature concerning the harmful effects of asbestos as early as the 1940s.

77. Plaintiff did not know that asbestos products were dangerous or harmful at the time of his exposures.

78. Defendant O-I had a duty to exercise reasonable care for the safety of plaintiff and others who worked with or were exposed to the defendants' asbestos products. As early as the 1940s, defendant O-I was on notice that asbestos was harmful and even conducted studies concerning the dangers of asbestos.

79. Defendant O-I breached its duty of care and was negligent, including without limitation in one or more of the following acts or omissions:

   a. Failed to adequately warn plaintiff or others of the health hazards of asbestos associated with Kaylo fire doors;

   b. Failed to investigate or test for the health effects of asbestos in Kaylo fire doors;

   c. Failed to instruct plaintiff, his employers, patent licensees, or others in the use of precautionary measures relating to airborne asbestos fibers released during production of Kaylo fire doors;

   d. Defectively designed the Kaylo fire doors to incorporate asbestos as an ingredient

18

or material in their production when substitute materials were available.

80.   As a direct and proximate result of the acts and omissions of the defendant O-I above, the plaintiff was injured as described above.


## COUNT II – PRODUCT LIABILITY (UNREASONABLY DANGEROUS PRODUCT)

81.   Plaintiffs bring this claim for strict product liability and restate and re-allege the allegations in paragraphs 1 – 80 above.

82.   This claim is asserted against O-I.

83.   O-I designed, manufactured, and sold Kaylo core to Roddis during the late 1940s into the late 1950s.

84.   The Kaylo core was used to make fire doors. It would cut, sawed, and sanded.

85.   Plaintiff was exposed to Kaylo dust in the 1950s when his parents brought it home on their clothes and in their family car.

86.   Defendant was in the business of selling Kaylo fire doors (including patent rights, doors, and cores) and other asbestos containing products.

87.   Pursuant to a written agreement, O-I sold the patented process right for each Kaylo fire door produced by Weyerhaeuser and collected a royalty payment.

88.   The Kaylo patent process was sold with the expectation by O-I that the process would be without substantial change and the production of doors pursuant to the process would release asbestos fibers in the air.

89.   Plaintiff was exposed to asbestos fibers released during the production of the Kaylo fire doors pursuant to the patented process.

19

90.  Defendants' patented process was defective and unreasonably dangerous in one or more of the following ways:

a.  Failed to adequately warn plaintiff or others of the health hazards of asbestos released during production of Kaylo fire doors;

b.  Failed to investigate or test for the health effects of asbestos released during production of Kaylo fire doors;

c.  Failed to instruct plaintiff, his employers, patent licensees, or others in the use of precautionary measures relating to airborne asbestos fibers released during production of Kaylo fire doors;

d.  Defectively designed the Kaylo fire doors to incorporate asbestos as an ingredient or material in their production when substitute materials were available.

91.  As a direct and proximate result of the acts and omissions of the defendants above, the plaintiff was injured as described above.


## COUNT III – NEGLIGENT NUISANCE

92.  Plaintiffs incorporate by reference all general the above allegations and brings this count against defendant Weyerhaeuser for negligent public and private nuisance.

93.  Weyerhaeuser is responsible for the ownership and operation of the door manufacturing plant in Marshfield, Wisconsin during the period of plaintiff's exposures.

94.  Weyerhaeuser, during operations to manufacture fire doors at the Marshfield plant beginning in the 1950s, caused asbestos fibers to be released and contaminate the air in various settings when plaintiff was not employed by Weyerhaeuser and was not engaged in work-related activities, including without limitation:

a.  living in the community of Marshfield;

20

b.   schools, homes, restaurants, taverns, vehicles and a creamery;

c.   emptying the air pollution control equipment;

d.   transportation of asbestos waste materials outside the plant onto roads, farmers' fields, old soaking pits and landfills;

e.   activities on the premises which were not work related; and

f.   failure of air pollution control equipment that released visible asbestos dust outside of the plant.

95.   The operations of Weyerhaeuser's Marshfield plant caused dangerous asbestos fibers to be transported to areas more distant through various means, including without limitation:

a.   worker clothing, personal effects, hair, and skin which had become contaminated by asbestos fibers at the plant; and

b.   collecting, removing, hauling, and dumping asbestos waste materials.

96.   The visible plant emissions and transport of asbestos fibers as described above caused contamination of the community, schools, downtown Marshfield, housing, vehicles, restaurants, bars, creamery and other places frequented by plaintiff Richard Masephol.

97.   Plaintiff and others inhaled asbestos fibers from the contaminated air and property.

98.   The contamination by the asbestos fibers is an unreasonable interference with a right common to the general public to clean air.

99.   The contamination by the asbestos fibers is an unreasonable interference with plaintiffs' private rights, including the right to use and enjoy private property.

100.   The unreasonable interference with the plaintiff's private rights and property and the public's right to clean air is unrelated to any employment relationship or duties with defendant.

101.  Weyerhaeuser Company had a duty to exercise reasonable care for the safety of plaintiff and the public from asbestos fibers released during Weyerhaeuser's operations of the Marshfield plant or transported to other locations as a result of plant operations.

102.  Weyerhaeuser knew or in the exercise of ordinary or reasonable care ought to have known asbestos causes disease and/or death.

103.  Plaintiff did not know that asbestos or asbestos products were so dangerous or harmful at the time of his exposures.

104.  Weyerhaeuser knew or in the exercise of ordinary or reasonable care ought to have known that Weyerhaeuser's Marshfield plant operations released asbestos into the community or resulted in transport of asbestos fibers to other locations as a result of plant operations.

105.  Weyerhaeuser permitted the Marshfield plant operations to continue without abating the release into the community and transport to other locations of asbestos fibers.

106.  Weyerhaeuser breached its duty of care and was negligent, including without limitation in one or more of the following acts or omissions:

     a.  Failed to adequately warn plaintiff or others of the health hazards of asbestos;

     b.  Failed to adequately investigate health effects of asbestos;

     c.  Failed to adequately test for air levels of asbestos;

     d.  Failed to adequately instruct plaintiff or others in the use of precautionary measures relating to airborne asbestos fibers;

     e.  Used defectively designed asbestos-containing products when substitutes were available;

     f.  Failed to use proper engineering techniques or methods, or used unsafe techniques or methods, in collecting, removing, hauling, and dumping of asbestos-containing materials.

g. Violated agency regulations issued pursuant to the United States Occupational Safety and Health Act, 29 U.S.C. §651, et seq.

h. Violated other agency regulations, including without limitation the United States Environmental Protection Agency National Emission Standards for Hazardous Air Pollutants, adopted originally as Part 61, Chapter 1, Title 40 of the Code of Federal Regulations effective on April 6, 1971.

i. Violated regulations issued by the Wisconsin Industrial Commission, including without limitation General Orders on Dusts, Fumes, Vapors and Gases, Order 2002; And Wis. Adm. Code Ind 12.20;

j. Exceeded other air quality standards or guidelines, including without limitation the Wisconsin Division of Natural Resources and Threshold Limit Values of the American Conference of Governmental Industrial Hygienists; and

k. Failed to take corrective action after being put on notice of the above negligent acts.

107. The asbestos fibers caused special injury of asbestos related disease to plaintiff Richard Masephol.

108. The contamination by asbestos fibers from the Marshfield plant operations:

a. Adversely affected the health interests of the community at large;

b. Interfered with the public health and safety;

c. Interfered with the right of plaintiffs to enjoyment and use of their property.

109. As a direct and proximate result of the nuisance, the plaintiff was injured as described above

## COUNT IV – INTENTIONAL NUISANCE

110. Plaintiffs incorporate by reference all general allegations above and brings this count against defendant Weyerhaeuser for intentional public and private nuisance.

111. Weyerhaeuser is responsible for the ownership and operation of the door manufacturing

23

plant in Marshfield, Wisconsin during the period of plaintiff's exposures.

112.   The operations of Weyerhaeuser's Marshfield plant caused release and emission of dangerous asbestos fibers which contaminated the air in the surrounding community where plaintiffs lived.

113.   The operations of Weyerhaeuser's Marshfield plant caused dangerous asbestos fibers to be transported to areas more distant through various means, including without limitation

   a.   contaminated worker clothing and personal effects; and

   b.   collecting, removing, hauling, and dumping asbestos waste materials.

114.   The plant emissions and transport of asbestos fibers as described above caused contamination of the community, housing, vehicles, lunchroom and other places frequented by plaintiff Richard Masephol.

115.   The contamination by the asbestos fibers is an unreasonable interference with a right common to the general public to clean air.

116.   The contamination by the asbestos fibers is an unreasonable interference with plaintiffs' right to use and enjoyment of private property.

117.   Plaintiff and others inhaled asbestos fibers from the contaminated air and property.

118.   The unreasonable interference with the public right to clean air and the private property rights is unrelated to any employment relationship or duties with defendant.

119.   Weyerhaeuser had knowledge of the dangers of asbestos fibers to cause serious diseases and death.

120.   Weyerhaeuser created conditions and activities that released asbestos fibers into the community as a result of Weyerhaeuser's operations of the Marshfield plant and transport

of asbestos fibers to other locations as a result of plant operations.

121.   Weyerhaeuser knew that asbestos fibers were being released into the community and transported to other locations as a result of plant operations.

122.   Weyerhaeuser knowingly, intentionally, and recklessly permitted the Marshfield plant operations to continue without abating the release into the community and transport to other locations of asbestos fibers.

123.   Plaintiff Richard Masephol suffered the special injury of asbestos related disease.

124.   The contamination by asbestos fibers from the Marshfield plant operations:

   d.      Adversely affected the health interests of the community at large;

   e.      Interfered with the public health and safety;

   f.      Interfered with the right of plaintiffs to enjoyment and use of their property.

125.   The conduct of Weyerhaeuser created an intentional nuisance for Weyerhaeuser is liable to plaintiffs for the injuries as described above.


**COUNT V– PRODUCTS LIABILITY – STRICT LIABILITY**

126.   Plaintiffs bring this claim for strict liability against defendant 3M.

127.   Plaintiffs restate and re-allege the allegations set forth in lines 1-125 above.

128.   Defendant was at all relevant times in the business of selling personal protective equipment, including without limitation masks.

129.   Defendants knew and expected the masks would be used to protect against the inhalation of asbestos fibers.

130.   Defendant placed its masks into the stream of commerce with the expectation that they

would reach plaintiff and other users and consumers without substantial change in the condition they were in when they left the possession or control of defendants.

131. Defendant's masks reached plaintiff without substantial or unforeseeable change in the condition in which it was sold.

132. Plaintiff used defendant's masks in the condition in which they left the possession or control of such defendants.

133. Defendant's masks was defective and unreasonably dangerous at the time it left the possession or control of defendants in one or more of the following ways:

    a.    Failed to adequately warn plaintiff or others of the health hazards of asbestos which existed when wearing defendant's masks;

    b.    Failed to investigate or test for the effectiveness of the masks in preventing the inhalation of asbestos fibers;

    c.    Failed to instruct plaintiff, his employers, or others about the inadequacies of using the masks as precautionary measures against airborne asbestos fibers;

    d.    Defectively designed such that the masks did not adequately protect against or prevent exposure to asbestos fibers;

        a.    Failed to specify or instruct in the proper use of the masks.

134. As a direct and proximate result of the acts and omissions of the defendants above, the plaintiff was injured as described above.

## COUNT VI – PRODUCTS LIABILITY – NEGLIGENCE

135. Plaintiffs bring this claim for negligence against defendant 3M.

136. Plaintiffs restate and re-allege the allegations set forth in lines 1-134 above.

137. It was reasonably foreseeable that defendant's personal protective masks would be used to

prevent exposure to asbestos.

138.   Defendants knew and expected the masks would be used to protect against the inhalation of asbestos fibers.

139.   Defendants represented or held out the masks to be adequate in the protection against inhalation of asbestos fibers during the type of operations at the Marshfield plant.

140.   The masks did not properly protect against inhalation of asbestos fibers from the operations at the Marshfield facility.

141.   Defendant had a duty to exercise reasonable care for the safety of plaintiff and others who used defendants' personal protective equipment to protect against exposure to asbestos fibers.

142.   Defendant knew or in the exercise of ordinary or reasonable care ought to have known asbestos causes disease and/or death.

143.   Defendant breached its duty of care and was negligent, including without limitation in one or more of the following acts or omissions:

   a.   Failed to adequately warn plaintiff or others of the health hazards of asbestos which existed when wearing defendant's masks;

   b.   Failed to investigate or test for the effectiveness of the masks preventing the inhalation of asbestos fibers;

   c.   Failed to instruct plaintiff, his employers, or others about the inadequacies of using the masks as precautionary measures against airborne asbestos fibers;

   d.   Defectively designed its personal protective equipment such that it did not adequately protect against or prevent exposure to asbestos fibers;

      a.   Failed to specify or instruct in the proper use of the masks.

144.   As a direct and proximate result of the acts and omissions of the defendants above, the

plaintiff was injured as described above.

## COUNT VII – CIVIL CONSPIRACY

145.   Plaintiffs bring this cause of action for civil conspiracy against defendant Metropolitan Life Insurance Company.

146.   Plaintiffs restate and re-allege the allegations set forth in lines 1 – 144 above.

147.   Defendant Metropolitan Life and other unnamed co-conspirators knowingly and willfully combined, agreed, and conspired with each other for the purpose of accomplishing one or more of the following unlawful purposes:

    a.   Suppressing information about the health hazards of asbestos, including medical and scientific data, from those persons who would be exposed to the asbestos from the products made and sold by the conspirators,

    b.   Affirmatively asserting, in a manner not warranted by the information possessed by the conspirators, claims that the conspirators knew were false, namely, that it was safe to work with and in close proximity to asbestos.

148.   One or more of the conspirators, including Metropolitan Life, performed the following tortious acts in furtherance of the conspiracy:

    a.   Failed to warn about health hazards of asbestos; failed to investigate health hazards of asbestos;

    b.   interfered with scientific and medical studies about the health hazards of asbestos; or

    c.   failed to instruct about precautionary measures required for protection.

149.   As a direct and proximate result of the acts of the conspiracy described above, the plaintiff was injured as described above.

## COUNT VIII – PUNITIVE DAMAGES

150.   Defendants acted maliciously, with intentional disregard for the rights of plaintiffs for which plaintiffs are entitled to recover punitive damages.

## COUNT IX - DECLORATORY JUDGMENT – UNCONSTITUTIONAL

151.   In 1995 Wisconsin enacted Act 17 which created restrictions on recoveries by victims of personal injuries.

152.   In 2011 Wisconsin enacted Act 2 which created restrictions on recoveries by victims of personal injuries.

153.   On March 27, 2014 Wisconsin enacted 2013 Act 154 which imposes requirements and creates restrictions on victims of asbestos-related injuries.

154.   Plaintiffs seek a declaration that retroactive application of 2005 Act 155 and 2011 Act 2 to limit the recovery in this case is unconstitutional.

155.   Plaintiffs seek a declaration that 2013 Act 154 is not applicable to this case or, in the alternative, that the requirements and restrictions it creates are unconstitutional.

## PRAYER FOR RELIEF

Plaintiffs pray for relief as follows:

   a.   Judgment against defendants, jointly and severally, for compensatory and general damages.

   b.   Punitive damages in an amount to be determined against each defendant.

   c.   A declaration that 1995 Act 17 and 2011 Act 2 are unconstitutional as applied to this case.

   d.   A declaration that 2013 Act 154 is not applicable to this case, or, in the alternative, that the requirements and restrictions it creates are unconstitutional.

29

e.  Such further legal and equitable relief as the court orders to do justice in this case, including without limitation award of costs and disbursements of this action.

## **JURY TRIAL DEMAND**

Plaintiffs hereby demands a trial by a jury.

Dated: September 19, 2014

/s/ Robert G. McCoy
Attorney for Plaintiff

Michael P. Cascino
Robert G. McCoy
Cascino Vaughan Law Offices, Ltd.
220 S. Ashland Avenue
Chicago, Illinois 60607
Phone: 312.944.0600
Fax: 312.944.1870
Email1: ecf.cvlo@gmail.com
Email2: mcascino@cvlo.com
Email3: bmccoy@cvlo.com

# Exhibit A

Defendants' States of Incorporation and Principal Places of Business

| Defendant | State of Incorporation | State of Principal Business |
|---|---|---|
| 3M Company | Delaware | Minnesota |
| Metropolitan Life Insurance Company | Delaware | New York |
| Owens-Illinois Inc. | Delaware | Ohio |
| Weyerhaeuser Company | Washington | Washington |